## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| HARTWIG TRANSIT, INC., and NORTH STAR TRUST # 11-5454, | ) ) | Case No. 10-cv-7448-JBZ |
|  | ) | Hon. James B. Zagel |
| *Plaintiffs,* | ) ) |  |
|  | ) |  |
| vs. | ) ) |  |
| RBS CITIZENS, N.A. d/b/a Charter One, as successor by merger with Charter One Bank, N.A., ROBERT A. SCHULTZ, and CHRISTOPHER SAWYER, | ) ) ) ) ) |  |
| *Defendants.* | ) ) |  |

### FIRST AMENDED COMPLAINT

NOW COME the Plaintiffs, Hartwig Transit, Inc., a/k/a Hartwig Brothers, and North Star Trust Company, as successor trustee to Harris, N.A., Successor Trustee to Harris Bank Barrington, not personally but as Trustee of Trust Agreement, dated May 8, 1998 and known as Trust No. 11-5454, by and through their undersigned attorneys, and as and for their First Amended Complaint against the Defendants, RBS Citizens, N.A., d/b/a Charter One as successor by merger with Charter One Bank, N.A.; Robert A. Schultz and Christopher Sawyer, allege and show the Court as follows:

### I.    JURISDICTION AND VENUE

1.    This honorable Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States.

2.    Plaintiffs' claims under the Commodity Exchange Act, §§ 4b and 4o (7 U.S.C. §§ 6b & 6o) lie within the exclusive jurisdiction of the United States District Courts, pursuant to 7

U.S.C. § 25(c). Plaintiffs' claims under the Bank Holding Company Act, 12 U.S.C. § 1972, are within the nonexclusive jurisdiction of the United States District Courts, pursuant to 12 U.S.C. § 1975.

3.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and 7 U.S.C. § 25(c).

## II.     THE PARTIES

4.     Plaintiff HARTWIG TRANSIT, INC., ("Hartwig Transit") is an Illinois corporation in good standing. Hartwig Transit's principal offices are located at 9329 Bernice Avenue, Schiller Park, Cook County, Illinois. Hartwig Transit is a cartage company for the U.S. Postal Service in the Midwest.

5.     Plaintiff NORTH STAR TRUST COMPANY, as successor trustee to Harris, N.A., Successor Trustee to Harris Bank Barrington, not personally but as Trustee of Trust Agreement, dated May 8, 1998 and known as Trust No. 11-5454, ("North Star," and, collectively with Hartwig Transit, "Plaintiffs") is a land trust owning certain real property located at 9329 Bernice Avenue, Schiller Park, Cook County, Illinois. The sole beneficiary of Trust No. 11-5454 is Hartwig Transit.

6.     Defendant RBS CITIZENS, N.A., d.b.a. CHARTER ONE, as successor by merger with Charter One Bank, N.A., ("RBS") is a national bank organized under the laws of the United States of America, with its main office at Providence, Rhode Island. RBS does business as Charter One in Illinois.

7.     Defendant ROBERT A. SCHULTZ ("Schultz") is a citizen of Illinois who was employed by RBS and acting on behalf of RBS at and around the time the transactions at issue

2

herein were entered into. Further, upon information and belief, Schultz is currently employed by RBS as a Senior Vice President of Charter One.

8.     Defendant CHRISTOPHER SAWYER ("Sawyer") is a citizen of Illinois who was employed by RBS and acting on behalf of RBS at and around the time the transactions at issue herein were entered into. Further, upon information and belief, Sawyer is currently employed by RBS as an Assistant Vice President of Charter One.

## III.     SUMMARY

9.     Plaintiffs Hartwig Transit and North Star bring this action against Defendants RBS, Schultz and Sawyer for engaging in fraudulent and deceptive conduct in connection with certain complex financing transactions involving synthetic fixed rate financing. Plaintiffs, an approximately 80-year old family business that provides trucking services to the U.S. Postal Service, required periodic bank financing for its operations as is routine in that industry. This financing was necessary to address the sharp spike in operating costs associated with heavy U.S. Postal deliveries during the winter holiday season. Traditional fixed rate loans had always been an essential part of the financing package that Plaintiffs needed for their business.

10.     Hartwig Transit and North Star were run by cousins Gerald and Royal Hartwig, ("the Hartwigs") and the late Wayne Wickwire, all of whom were unsophisticated as regards complex financing. Plaintiffs had no experience whatsoever with synthetic fixed rate financing or interest rate swaps. In fact, before being induced by Schultz and Sawyer to move their banking business over to RBS, Plaintiffs had dealt with only two banks over the past forty plus years and had obtained only traditional, straightforward financing packages. Shortly after Schultz and Sawyer moved to RBS, they recommended that Plaintiffs move with them, from LaSalle Bank (newly merged with Bank of America) to RBS. Schultz and Sawyer advised

3

Plaintiffs to replace their existing financing package with a new one at RBS. Had Plaintiffs understood that the replacement financing package at RBS included complex derivatives such as interest rate swaps, Plaintiffs would not have approved the replacement financing. Plaintiffs believed they were receiving the same type of fixed-rate loans they had received many times before with Schultz and Sawyer. Plaintiffs trusted Schultz and Sawyer, and thus, when presented with signature pages at closing, Plaintiffs simply signed the documents as they had done many times before. Schultz and Sawyer were well aware of these facts due to their longstanding banking relationship with the Hartwigs predating their move to RBS.

11.    RBS, acting through Schultz and Sawyer, devised three synthetic fixed rate financing packages for Plaintiffs that included three interest rate swaps that corresponded to three variable rate loans. Two of the packages were for Hartwig Transit and one was for North Star (the entity that held certain real estate for the benefit of Hartwig Transit). Unbeknownst to Plaintiffs, this complex financing structure consisted of two separate and distinct sets of transactions. First, the borrower (Plaintiffs) obtained from the lender (RBS) three variable rate loans that required periodic variable loan interest payments based on a stated formula. Second, the borrower (Plaintiffs) entered into three interest rate swap transactions with the lender (RBS) also acting as the swap provider. Under the swaps, Plaintiffs paid RBS fixed rates and RBS paid Plaintiffs variable rates that were identical to the variable interest payments on the loans. The net effect of these dizzying sets of transactions is that all of the variable interest payments on the swaps and the loans are a wash, with Plaintiffs paying fixed interest rates to RBS pursuant to the three swaps. Thus, it might be said that the variable rates on the three term loans at issue have been "converted" into a fixed rate when the transactions are viewed as a whole. However, the

4

devil is in the details (i.e., the extra fees, costs and penalties), which, like the nature of financing package itself, were not disclosed to Plaintiffs and/or misrepresented.

12.     The three swaps are separate legal transactions and exist independent of the variable rate loans.  Additionally, the swaps involved additional fees, a higher potential cost of default (i.e., swap termination damages), and the risk of the lender's failure to pay under the swaps (due to bankruptcy or other reasons), with the borrower remaining obligated to pay under the loans.  Schultz and Sawyer did not disclose any of these risks to Plaintiffs.  To the contrary, Schultz and Sawyer concealed from Plaintiffs that the swaps were separate transactions with added drawbacks as compared to the traditional loans they had received over the past several decades, some of which Schultz and Sawyer had personally sold to them while they were at the prior bank.  Had Schultz and Sawyer not concealed these facts from Plaintiffs, Plaintiffs would not have entered into the replacement financing package.

13.     Plaintiffs, whose principals had no more than a high school education, reasonably believed Schultz and Sawyer, who possessed a unique and specialized expertise with regard to such complex financings.  Further, as a result of Schultz' and Sawyer's superior and specialized expertise, Plaintiffs had routinely accepted Schultz's and Sawyer's recommendations in connection with their banking relationships at the prior bank, LaSalle Bank, as well as at RBS.

14.     Indeed, RBS, acting through Schultz and Sawyer, took steps to conceal the separate nature and additional costs and risks of the swaps from Plaintiffs before and during the closing on the financing, which occurred on July 8, 2008.  In fact, on the day of the closing, which occurred in the morning at the offices of Hartwig Transit, Schultz falsely declared the closing complete after the loan documents were signed, prompting Royal Hartwig to leave. Schultz then presented to Gerald Hartwig, alone, only two pages of each of three seven-to-nine-

5

page swap confirmation agreements. The pages provided showed only the schedules of underlying loan principal amounts, not any of the terms of the swaps themselves. Thus, it appeared to Gerald Hartwig that he was merely signing amortization schedules with regard to the loans, not entering into any agreement concerning swaps. Schultz and Sawyer having concealed the critical terms pages of the confirmations, Gerald Hartwig also did not know that the confirmations incorporated by reference a standard swap agreement, the International Swap Dealers' Association Master Agreement ("the ISDA Agreement"). Of course, Schultz and Sawyer had also withheld the ISDA Agreement itself, as well as the "Schedule" of special terms drafted by RBS and appended thereto. The Hartwigs would not receive those documents from RBS until two months later, in September 2008. So, when Gerald Hartwig signed what he believed to be amortization schedules for the underlying loans, he was actually signing a confirmation agreement with terms the Hartwigs had never seen, which incorporated a standard swap-industry agreement the Hartwigs had never received, which, in turn, incorporated an RBS-drafted Schedule of special terms the Hartwigs had never received.

15. Schultz and Sawyer, on behalf of RBS, thus carefully concealed from Plaintiffs that the financing package they would receive from RBS would be quite different from those they received from Schultz and Sawyer at their prior banks. Schultz and Sawyer took positive steps to obscure the addition of complex, risky and costly derivatives, the interest rate swaps, to what Plaintiffs understood to be a package of straightforward fixed-rate loans, like those to which Plaintiffs were accustomed.

16. For the reasons alleged herein, Plaintiffs seek to recover damages and relief caused by the Defendants' misconduct, variously including among other things, fraud, deception, and misrepresentations.

6

## IV.    FACTS COMMON TO ALL COUNTS

### A.    Background

17.    The Hartwig Family has been in the trucking business for over eighty years. Today, members of the third and fourth generations of Hartwigs, Gerald and Royal Hartwig (hereinafter, collectively, "the Hartwig Family"), own and operate a business, Hartwig Transit, that runs about one hundred trucks, traveling more than one million miles a month, in fourteen states.  For decades, Hartwig Transit's sole business has consisted of delivery of mail for the U.S. Postal Service over large portions of the Midwest.  Hartwig Transit is a principal cartage company for the U.S. Postal Service in the Midwest.

18.    The late Wayne Wickwire was the president of Hartwig Transit.  Kevin Wickwire has recently taken over his late father's share of the company and is now a vice president of Hartwig Transit.

19.    Hartwig Transit, like many trucking companies, require bank financing to operate. In fact, for companies to be eligible to make competitive bids and obtain contracts with the U.S. Postal Service, they must show that they have adequate financing.  Further, it is critical that bankers dealing with trucking companies like Hartwig Transit understand the special needs and risks of the industry and their particular business.  In the case of Hartwig Transit, such special financing needs included working capital, equipment loans and lines of credit, with the companies' trucks, or "rolling stock," as security. Having reliable and specially tailored financing solutions is critical to the viability of Hartwig Transit.

20.    Thus, when the Hartwig Family found bankers they believed they could trust, who understood their business, and who could provide them with specially tailored financing, they stayed with them exclusively.  From approximately 1966 until 2008, the Hartwig Family

7

had worked with only two banks with regard to their trucking business, Harris Bank and LaSalle Bank (now owned by Bank of America).

21.     Schultz and Sawyer had been the Hartwigs' exclusive banking team for several years when the two left LaSalle Bank after its takeover by Bank of America in 2007. Schultz and Sawyer approached the Hartwig Family in or around early 2008 and induced them to replace the financing package they had with LaSalle Bank/Bank of America with new financing packages from RBS.

22.     Schultz and Sawyer were aware of the financial history and special needs of the Hartwig Family's business. They were also aware that the late Wayne Wickwire, Gerald Hartwig and Royal Hartwig had experience only in the trucking business, were not conversant in complex financial concepts and had no education beyond high school. Schultz and Sawyer took advantage of this state of affairs when they induced Plaintiffs to replace their existing financing package, with which Plaintiffs were satisfied, with a new financing package from RBS, one with hidden complexity, risks and costs.

**B.     Schultz and Sawyer Induce Plaintiffs to Move Their Banking Business to RBS and, for the First Time, Sell Them Interest Rate Swaps**

23.     In or about early 2008, preliminary discussions ensued between the Hartwig Family, and Schultz and Sawyer concerning the proposed financing package they needed for their business to survive. Throughout their discussions, Schultz and Sawyer repeatedly reminded the Hartwig Family that they could continue to trust them and their new employer, RBS, to look out for their best interests.

24.     On April 9, 2008, Sawyer sent an email to Gerald and Royal Hartwig, copying Schultz, which included a letter from Schultz (hereinafter, the "April 9th Email"). The letter attached to the April 9th Email included the following representations:

8

... As we have discussed, Charter One [RBS] is an innovative and valued advisor for its clients and as such, this proposal constitutes a custom financing package . . . We believe that the following points are at the heart of our relationships with out clients and would be important to you as well:

- Knowing our clients business and providing timely solutions to financing and depository needs as they arise

- Proactively working with our clients to understand their upcoming challenges and understanding a clients long term plans as you structure for current needs

- Providing a relationship with a local institution backed by a global bank with expertise in all facets of your potential financial needs, both business and personal

I have greatly enjoyed working with you and being an advocate for your company, and the following represents my thoughts on how to continue to help Hartwig succeed in the marketplace.

25.     The April 9th Email from Sawyer accompanying the letter closed with, "Rob [Schultz] and I are looking forward to continuing on as Hartwig's banking partners!"

26.     Shortly before the closing on the financing package for Hartwig Transit and North Star, in late June or early July 2008, Sawyer approached Royal Hartwig, the younger of the two Hartwig cousins, with regard to the proposed financing package. Among other things, Sawyer mentioned a "swapping" of interest rates. Sawyer did not provide any comment or explanation of what this meant. Royal understood this term to mean something internal to RBS's process with regard to the financing package. Sawyer did not explain that the RBS replacement

9

financing would include additional transactions, the interest rate swaps. Thus, Royal thought little of the "swapping" concept and continued to believe that the RBS replacement financing package would have only the same components as the existing financing package with LaSalle Bank. Because it seemed inconsequential, Royal did not mention this to his older cousin, Gerald.

27.    Before this time, none of the Hartwigs had ever heard of an interest rate swap and neither Schultz nor Sawyer had discussed this form of financing with any of the Plaintiffs or their principals. Schultz and Sawyer represented to the Hartwigs that the RBS replacement financing package was no different than the traditional fixed-rate loans they had been receiving at their prior banks. Schultz and Sawyer concealed from the Hartwigs that the replacement package included complex derivatives, with unique costs, risks and penalties of their own.

28.    By way of background (which Defendants did *not* explain to Plaintiffs), an interest rate swap is a contractual arrangement between two parties, often referred to as "counterparties." The counterparties exchange payments based on a defined principal amount for a fixed period of time. In an interest rate swap, the principal amount is not exchanged between the counterparties and, therefore, is referred to as the "notional amount" or "notional principal." Interest rate swaps do not generate new sources of funding themselves. Instead, they convert one interest rate basis to a different rate basis (for example, from a floating or variable rate basis to a fixed interest rate basis, or vice versa). Under a "floating to fixed rate swap," which is the derivative at issue, the borrower agrees to pay the swap dealer (or bank) a *fixed* interest rate, and the swap dealer agrees to pay the borrower a *variable* rate based on an index such as LIBOR, plus a "spread," an additional percentage interest reflecting the risks of the particular transaction.

10

29.    The complex financing structure Defendants devised for Plaintiffs, which was never explained to Plaintiffs, consisted of two separate and distinct sets of transactions. First, the borrower (Plaintiffs) obtained from the lender (RBS) three variable rate loans that required periodic variable loan interest payments based on a stated formula. Second, the borrower (Plaintiffs) entered into three interest rate swap transactions with the lender (RBS) also acting as the swap provider. Under the swaps, the Plaintiffs paid RBS fixed rates and RBS paid Plaintiffs variable rates that were identical to the variable interest payments on the loans. As diagramed below, the net effect of these three sets of transactions is that all of the variable interest payments are a wash, with Plaintiffs paying fixed interest rates to RBS pursuant to the three swaps:



///

///

///

30.    With regard to the three interest rate swaps at issuer herein, each of the them corresponds to one of the three term Loans that Plaintiffs received at the closing on July 8, 2008. The swaps are described in the table below:

| SWAP | Notional Amount (*matches* the Principal Amount on the Loans) | Fixed Rate Paid to RBS | Floating Rate Paid By RBS (*matches* the variable rate on the Loans) |
|---|---|---|---|
| Hartwig Swap A | $ 2,277,844.74 | 6.16% | LIBOR + 2.25% |
| Hartwig Swap B | $ 712,464.06 | 5.71% | LIBOR + 2.25% |
| North Star Swap | $ 900,000.00 | 6.72% | LIBOR + 2.25% |

31.    RBS, acting through Schultz and Sawyer, represented to the Hartwigs that the replacement financing package was substantively the same as the traditional fixed rate loans Plaintiffs had previously obtained over the past few decades. This was false. In fact, among other things, the swaps involved additional fees, there was a higher potential cost of default (i.e., swap termination damages), and there was the risk of the lender's failure to pay under the swap (due to bankruptcy or other reasons), with the borrower remaining obligated to pay under the loans.

32.    Additionally, at the closing of the swap transactions and related loans, on July 8, 2009, Schultz and Sawyer had not discussed the swaps with the Hartwigs, except for Sawyer's brief mention of the concept to Royal. As discussed above, based on this brief mention, Royal did not even understand the "swapping" to involve separate transactions for the Hartwigs. He believed the term merely referred to some internal process at RBS that would not impact the Hartwigs or their business in any way. This belief was pursuant to Schultz and Sawyer's

assurances that the replacement package from RBS was made up of the same components as the prior financing packages.

33.     RBS, acting through Schultz and Sawyer, took steps to conceal the separate nature and additional costs and risks of the swaps from Plaintiffs before and during the closing on the financing, which occurred on July 8, 2008.  On the morning of July 8, 2008, Schultz and Sawyer arrived at the offices of Hartwig Transit for the closing.  During the closing, Schultz and Sawyer simply indicated the signature pages for Plaintiffs to sign for the various loan documents.  There was little or no discussion of the contents of the documents, as Plaintiffs understood them to constitute merely a replacement of the financing that they had before, with no additional bells or whistles.  None of the Plaintiffs or their principals read or reviewed any of the documents, and the Plaintiffs were not represented by counsel.

34.     Once the signing of the loan documents was complete, Schultz made a phone call to Michael Liberatore, a broker for RBS.  Gerald and Royal Hartwig understood this merely to be a "locking in" of rates on their loans, as they were familiar with from home financing.  Once the phone call was over, and the rates confirmed, Schultz falsely declared the closing complete. This prompted Royal Hartwig to leave.

35.     However, the closing was not complete.  After Royal left, Schultz presented to Gerald Hartwig, alone, signature pages from three swap confirmation forms (one for each of the swaps) that had been faxed by Michael Liberatore.  Each of the complete swap confirmation forms was seven to nine pages long, including critical terms of the swap transactions, laying out the floating (variable) and fixed rates to be paid on each side and describing termination rights and consequences, among other things.  Moreover, the confirmations incorporated by reference a standard industry swap agreement, the International Swap Dealers' Association Master

13

Agreement ("the ISDA Agreement"). The ISDA Agreement is a detailed, approximately eighteen-page, standard form agreement, created by the International Swap Dealers Association, Inc. ("ISDA"), that is used in most swap transactions. This agreement provides standard terms and definitions for language used in swap confirmations, as well as duties, conditions and rights of the parties to swap transactions not provided for by the routinely brief swap confirmations. The ISDA Agreement itself incorporates a "Schedule" which includes special terms to be determined by the parties.

36.     Gerald Hartwig received had seen **none** of these terms or agreements when he signed the detached signature pages from the confirmations. In addition to removing all of the material term pages from the confirmations, Schultz and Sawyer had withheld the ISDA Agreement itself, as well as the "Schedule" of special terms drafted by RBS to its benefit. None of the Plaintiffs had seen any of these documents when Gerald Hartwig signed the detached signature pages. Gerald himself believed that he was merely signing "amortization schedules" with regard to the loans, not agreements concerning swaps. The detached pages of the confirmations indeed appeared to be amortization schedules, as they included "Notional Schedules," showing the decrease over time in the principal balance on the note corresponding to each swap.

37.     Plaintiffs did not receive the ISDA Agreement and RBS-drafted Schedule thereto until two months after the closing, in September 2008. However, by this time, Plaintiffs had gradually begun to understand the true nature of the financing package and would not sign the ISDA Agreement.

1268077.1
22057-890

38.     Schultz's and Sawyer's concealment of confirmations, the ISDA Agreement and Schedule thereto were deliberate steps in their plan to keep Plaintiffs in the dark with regard to the swaps.

39.     RBS, Schultz and Sawyer did in fact benefit, through deceptive means, from the swaps at the expense of Plaintiffs. RBS was able to create an additional layer of obligations, costs and penalties for Plaintiffs. Upon information and belief, RBS benefited from closing costs and other fees associated with the swaps as RBS used one of its own brokers, Michael Liberatore of "Charter One" to execute the swaps. Further, RBS was the counterparty on all three of the swaps, so RBS had the option of selling the swaps to a third party and profiting thereby.

40.     Further, RBS, acting through Schultz and Sawyer, structured the swaps so as to surreptitiously multiply the applicable penalties for any default on the related term loans. The details of these penalties were referenced in the confirmation pages which were concealed from Plaintiffs, which further incorporated the terms of the ISDA Agreement and Schedule thereto, which RBS also concealed from the Plaintiffs until two months *after* the closing.

41.     Upon information and belief, certain facts regarding the foregoing are exclusively within the Defendants' possession, including emails, telephone records, and notes of conversations. This information and belief is based upon the following: (1) the dubious circumstances surrounding the above-described closing on or July 8, 2008, detailed above; (2) the coordinated activity between Schultz and Sawyer to induce Plaintiffs to move their banking business to RBS; and (3) Defendants' concealment of the material terms of the confirmations (as well as the nature of the confirmations themselves as swap agreements, not amortization schedules), the concealment of the ISDA Agreement and the concealment of the Schedule thereto from Plaintiffs.

15

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of Section 4b of the Commodity Exchange Act -
Contracts Designed to Defraud or Mislead
(7 U.S.C. § 6b)**

42.    Plaintiffs incorporate by reference each allegation set forth above as if fully set forth herein, and further alleges as follows:

43.    Section 4b of the Commodity Exchange Act ("CEA"), "Contracts designed to defraud or mislead" provides, in relevant part, "It shall be unlawful for any person, in or in connection with any order to make, or the making of, any contract . . . for future delivery . . . to cheat or defraud or attempt to cheat or defraud the other person. (7 U.S.C. § 6b(a).)

44.    Defendants made use of the means and instrumentalities of interstate commerce, including the U.S. mails and telephones in communicating with Plaintiffs with regard to the interest rate swaps at issue herein, and used such methods to deceive and cheat Plaintiffs.

45.    The swaps at issue herein are contracts for future delivery, as per the terms of Section 4b of the CEA. The swaps at issue in this matter are not exempt from the CEA because neither Hartwig Transit nor North Star is an "eligible swap participant," as per the limited swap exemption of 17 C.F.R. § 35.1. Neither Hartwig Transit nor North Star had (or has) "total assets exceeding $10,000,000" or "a net worth exceeding $1,000,000," and any obligations they may have had under the swaps were in no way guaranteed or backed by a letter of credit or other support agreement. (17 C.F.R. § 35.1(b)(vi).) Schultz and Sawyer, having worked with the Hartwig Family for years, were well aware of these facts at the time the swaps were executed.

46.    At all times relevant to this complaint, Defendants owed Plaintiffs a duty of care, namely to refrain from such conduct as would suffice to violate the antifraud provisions of the

16

Section 4b as to recommending and providing contracts for future delivery such as the swaps herein. Namely, Defendants owed a duty to Plaintiffs not to cheat, defraud, deceive, or conceal material facts, or otherwise conspire or attempt to do so.

47.     Schultz and Sawyer had been the Hartwigs' exclusive banking team for several years when the two left LaSalle Bank after its takeover by Bank of America in 2007. Schultz and Sawyer approached the Hartwig Family in early Spring 2008 and convinced them to move their banking business from LaSalle Bank/Bank of America to RBS, their new employer.

48.     Schultz and Sawyer, as agents of RBS, had vastly superior knowledge with regard to financial instruments such as the complex derivatives at issue herein. Schultz and Sawyer were aware that the Hartwig Family was unsophisticated and that they were relying upon Schultz and Sawyer to recommend and provide financial solutions that would not add unnecessary costs, risks and penalties to their financing package. Based on the superior and unique expertise of Schultz and Sawyer, Plaintiffs had routinely accepted their recommendations as regards financing packages that had been proposed at their prior bank.

49.     Schultz and Sawyer took advantage of the Hartwig Family's lack of sophistication and their complete trust in Schultz and Sawyer, falsely assuring the Hartwigs that they would receive the same types of loans and other credit facilities that they had previously received at LaSalle Bank and prior banks. Instead, by means of deceptive conduct and materially misleading statements, Schultz and Sawyer induced Plaintiffs to replace their existing financing package with a new one at RBS that included interest rate swaps bearing additional costs, risks and penalties. Had Plaintiffs understood that the replacement financing package at RBS included complex derivatives such as interest rate swaps, Plaintiffs would not have approved the replacement financing. Schultz and Sawyer were aware of this, and thus, they falsely reassured

17

Plaintiffs that they were receiving the same type of fixed-rate loans they had received many times before with Schultz and Sawyer. Further, Schultz and Sawyer concealed material facts that would have caused Plaintiffs to become aware of the true nature of the refinancing package.

50.     RBS, acting through Schultz and Sawyer, took steps to conceal the separate nature and additional costs and risks of the swaps from Plaintiffs before and during the closing on the refinancing package. During the closing, Schultz and Sawyer simply indicated the signature pages for Plaintiffs to sign for the various loan documents, which Plaintiffs signed without reading, based upon their trust in Schultz and Sawyer. Schultz then presented to Gerald Hartwig, alone, detached signature pages from swap confirmation forms, which appeared to be amortization schedules for the loans. Thus, Defendants concealed from Gerald Hartwig not only the material terms of the swap confirmation forms themselves but even the fact that he was signing swap agreements. To further this plan of deception, Schultz and Sawyer concealed the ISDA Agreement, referred to and incorporated by reference in the omitted pages of the confirmations, as well as the RBS-drafted special Schedule thereto.

51.     Through the above plan of deception, Defendants' successfully concealed the true nature of the refinancing package from Plaintiffs, namely, that it included complex derivatives with additional costs, risks and penalties. As a result of Defendants' actions, Plaintiffs have suffered damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### Violations of Section 4o of the Commodity Exchange Act - Fraud and Misrepresentation by Commodity Trading Advisor (7 U.S.C. § 6o)

52.     Plaintiffs incorporate by reference each allegation set forth above as if fully set forth herein, and further alleges as follows:

53.     Section 4o of the CEA, concerning fraud and misrepresentation by commodity trading advisors, commodity pool operators and their employees, provides, in relevant part, "It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor . . .directly or indirectly . . . to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant." (7 U.S.C. § 6o(1).)

54.     Defendants made use of the means and instrumentalities of interstate commerce, including the U.S. mails and telephones in communicating with Plaintiffs with regard to the interest rate swaps at issue herein, and used such methods to deceive and cheat Plaintiffs.

55.     Upon information and belief, RBS acted as a Commodity Trading Advisor for purposes of 7 U.S.C. § 6o, with regard to the swaps in question. The CEA defines "Commodity Trading Advisor," in relevant part, as any person who "for compensation or profit, engages in the business of advising others . . . as to the value of or the advisability of trading in . . . any contract for future delivery . . .." (7 U.S.C. § 1a(6)(A).) This definition excludes "any bank or trust company or any person acting as an employee thereof," but only insofar as "the furnishing of such services by [such] persons . . . is solely incidental to the conduct of their business or profession." (7 U.S.C. § 1a(6)(B)(i) & 6(C).)

56.     During all relevant times, RBS was in the business of providing advice with regard to interest rate swaps and this business was not solely incidental to its banking business, upon information and belief. In certain marketing materials that RBS provided to Plaintiffs, RBS states that it is "A leader in interest rate derivatives," and that its subsidiary, RBS Greenwich Capital was ranked number four in "Market Depth" in the category of "Interest Rate Derivatives

19

Performance," in 2006, behind Deutsche Bank, JP Morgan and Lehman Brothers. Thus, upon information and belief, RBS actively markets its advice with regard to interest rate derivatives, such as swaps, to the public though it has not registered with the Commodity Futures Trading Commission as a Commodity Trading Advisor.

57.     Schultz and Sawyer, as agents of RBS, had vastly superior knowledge with regard to financial instruments such as the complex derivatives at issue herein. Schultz and Sawyer were aware that the Hartwig Family was unsophisticated and that they were relying upon Schultz and Sawyer to recommend and provide financial solutions that would not add unnecessary costs, risks and penalties to their financing package. Based on the superior and unique expertise of Schultz and Sawyer, Plaintiffs had routinely accepted their recommendations as regards financing packages that had been proposed at their prior bank.

58.     Schultz and Sawyer took advantage of the Hartwig Family's lack of sophistication and their complete trust in Schultz and Sawyer, falsely assuring the Hartwigs that they would receive the same types of loans and other credit facilities that they had previously received at LaSalle Bank and prior banks. Instead, by means of deceptive conduct and materially misleading statements, Schultz and Sawyer induced Plaintiffs to replace their existing financing package with a new one at RBS that included interest rate swaps bearing additional costs, risks and penalties. Had Plaintiffs understood that the replacement financing package at RBS included complex derivatives such as interest rate swaps, Plaintiffs would not have approved the replacement financing. Schultz and Sawyer were aware of this, and thus, they falsely reassured Plaintiffs that they were receiving the same type of fixed-rate loans they had received many times before with Schultz and Sawyer. Further, Schultz and Sawyer concealed material facts that would have caused Plaintiffs to become aware of the true nature of the refinancing package.

20

59.    Through the above plan of deception, Defendants' successfully concealed the true nature of the refinancing package from Plaintiffs, namely, that it included complex derivatives. Through the concealed addition of the derivatives, RBS was able to create an additional layer of obligations, costs and penalties for Plaintiffs. Upon information and belief, RBS benefited from closing costs and other fees associated with the swaps as RBS used one of its own brokers, Michael Liberatore of "Charter One" to execute the swaps. Further, RBS was the counterparty on all three of the swaps, so RBS had the option of selling the swaps to a third party and profiting thereby.

60.    RBS structured the swap agreements so as to multiply the applicable fees costs and penalties, upon information and belief. RBS buried certain of these specially drafted provisions in the Schedule to the ISDA Agreement, which RBS withheld from Plaintiffs until well after the closing on the swaps and loans.

61.    As a result of Defendants' actions, Plaintiffs have suffered damages in an amount to be proven at trial.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.    For rescission of the swaps and restitution of amounts paid by Plaintiffs to RBS;

B.    For an award of money damages for all losses and damages suffered as a result of the acts complained of herein, together with prejudgment interest, in an amount to be determined at trial;

C.    For an award of the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

/ / /

21

D.     For such other and further relief as this honorable Court may deem just and

proper.

Dated: February 4, 2011                    Respectfully submitted,

                                           Hartwig Transit, Inc., and
                                           North Star Trust #11-5454

                                           By:   /s/ Sylvia M. Scott
                                                 SYLVIA M. SCOTT
                                                 Pro Hac Vice Attorney for Plaintiffs

PRO HAC VICE COUNSEL
Sylvia M. Scott (CA State Bar #134360)
FREEMAN, FREEMAN & SMILEY, LLP
3415 S. Sepulveda Blvd., Suite 1200
Los Angeles, CA 90034
T:     (310) 255-6161
F:     (310) 255-6163
sms@ffslaw.com

LOCAL COUNSEL
Nancy Lee Carlson (IL State Bar # 6189998)
LAW OFFICE OF NANCY LEE CARLSON
926 Braeburn Road
Inverness, IL 60067
T:     (847) 358-1775
F:     (847) 358-3227
nancyleecarlson@msn.com

LOCAL COUNSEL
("Bert") James B. Zaczek (IL State Bar # 6217079)
311 N. Aberdeen, Suite 300-B
Chicago, IL 60607
T:     (312) 527-1090
F:     (312) 527-1082
bert@bzlegal.net

        / / /

1268077.1
22057-890

## VII.  JURY DEMAND

      Plaintiffs demand a jury trial on all issues so triable.

Dated:  February 4, 2011

                                        Respectfully submitted,

                                        Hartwig Transit, Inc., and
                                        North Star Trust #11-5454

                            By:   /s/ Sylvia M. Scott
                                   SYLVIA M. SCOTT
                                   Pro Hac Vice Attorney for Plaintiffs

PRO HAC VICE COUNSEL
Sylvia M. Scott (CA State Bar #134360)
FREEMAN, FREEMAN & SMILEY, LLP
3415 S. Sepulveda Blvd., Suite 1200
Los Angeles, CA 90034
T:     (310) 255-6161
F:     (310) 255-6163
sms@ffslaw.com

LOCAL COUNSEL
Nancy Lee Carlson (IL State Bar # 6189998)
LAW OFFICE OF NANCY LEE CARLSON
926 Braeburn Road
Inverness, IL 60067
T:     (847) 358-1775
F:     (847) 358-3227
nancyleecarlson@msn.com

LOCAL COUNSEL
("Bert") James B. Zaczek (IL State Bar # 6217079)
311 N. Aberdeen, Suite 300-B
Chicago, IL 60607
T:     (312) 527-1090
F:     (312) 527-1082
bert@bzlegal.net

        / / /

        / / /

## VIII. <u>NOTIFICATION OF NO PUBLICLY HELD AFFILIATES</u>

As per Rule 3.2 of the Local Rules of the U.S. District Court of the

Northern District of Illinois, Plaintiff HARTWIG TRANSIT, INC., an Illinois

corporation, states that it has no publicly held affiliates. Plaintiff NORTH STAR

TRUST COMPANY, not personally but in its capacity as successor trustee of

Trust Agreement, dated May 8, 1998 and known as Trust No. 11-5454, an Illinois

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

24

land trust of which the sole beneficiary is HARTWIG TRANSIT, INC., also states that it has no publicly held affiliates.

Dated: February 4, 2011

Respectfully submitted,

Hartwig Transit, Inc., and
North Star Trust #11-5454

By:  /s/ Sylvia M. Scott
     SYLVIA M. SCOTT
     Pro Hac Vice Attorney
     for Plaintiffs

PRO HAC VICE COUNSEL
Sylvia M. Scott (CA State Bar # 134360)
FREEMAN, FREEMAN & SMILEY,
LLP
3415 S. Sepulveda Blvd., Suite 1200
Los Angeles, CA 90034
T:      (310) 255-6161
F:      (310) 255-6163
sms@ffslaw.com

LOCAL COUNSEL
Nancy Lee Carlson (IL State Bar # 6189998)
LAW OFFICE OF NANCY LEE
CARLSON
926 Braeburn Road
Inverness, IL 60067
T:      (847) 358-1775
F:      (847) 358-3227
nancyleecarlson@msn.com

LOCAL COUNSEL
("Bert") James B. Zaczek (IL State Bar #
6217079)
311 N. Aberdeen, Suite 300-B
Chicago, IL 60607
T:      (312) 527-1090
F:      (312) 527-1082
bert@bzlegal.net

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on February 4, 2011, she served the foregoing **FIRST AMENDED COMPLAINT** upon the following parties identified as Registrants through the Court's Electronic Notice for Registrants and upon non-registrants by U.S. Mail and facsimile transmission from 3415 S. Sepulveda Blvd., Suite 1200, Los Angeles, California 90034.

**Service via ECF:**

Nancy Lee Carlson
Email: nancyleecarlson@msn.com
    Attorneys for Plaintiffs HARTWIG TRANSIT, INC. and NORTH STAR TRUST #11-5454
James B. Zaczek
Email: bert@bzlegal.net
    Attorneys for Plaintiffs HARTWIG TRANSIT, INC. and NORTH STAR TRUST #11-5454
Thomas M. Lombardo
Email: tlombardo@riemerlaw.com
    Attorneys for Defendants RBS CITIZENS, N.A. d/b/a Charter One, as successor by merger with Charter One Bank, N.A., et al.
Jeffrey D. Ganz
Email: jganz@riemerlaw.com
    Attorneys for Defendants RBS CITIZENS, N.A., Christopher Sawyer, Robert A. Schultz

**Service via U.S. Mail and Facsimile Transmission:**

Thomas Wickham Schmidt
Liebmann Conway Olejniczak SC
231 S. Adams Street
P.O. Box 23200
Green Bay, WI 54305-320
Fax No.: (920) 437-2868

Steven W. Jelenchick
Beck Chaet Bamberger & Polsky SC
2 Plaza East
330 E. Kilbourn Avenue, Suite 1085
Milwaukee, WI 53202
Fax No.: (414) 273-7786

### /s/ Sylvia M. Scott

26